UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



'02 MAR 28 AM 0:35

NORMAN SALSITZ,

      Plaintiff,

v.

JACQUES A. NASSER, MICHAEL D.
DINGMAN, EDSEL B. FORD, II,
WILLIAM CLAY FORD, WILLIAM CLAY
FORD, JR., IRVINE O. HOCKADAY,
JR., MARIE-JOSEE KRAVIS, ELLEN R.
MARRAM, HOMER A. NEAL, JORMA J.
OLLILA, CARL E. REICHARDT, ROBERT
E. RUBIN, and JOHN L. THORNTON,

      Defendants,

   - and -

FORD MOTOR COMPANY,

      Nominal Defendant.

Case No. 00-74181

Hon. George E. Woods

Magistrate Judge Pepe

---

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A. Gilchrist Sparks, III (Del. Bar No. 467)
Kenneth J. Nachbar (Del. Bar No. 2067)
Jessica Zeldin (Del. Bar. No. 3558)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

LOCAL COUNSEL:

Seth D. Gould (Mich. Bar No. P45465)
FEENEY KELLETT WIENNER & BUSH
35980 Woodward Avenue, Second Floor
Bloomfield Hills, MI 48304-0934
(248) 258-1580

Attorneys for Defendants Jacques A. Nasser,
Michael D. Dingman, Edsel B. Ford, II, William Clay
Ford, William Clay Ford, Jr., Irvine O. Hockaday, Jr.,
Marie-Josee Kravis, Ellen R. Marram, Homer A. Neal,
Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, and
John L. Thornton, and Ford Motor Company

43

Defendants Jacques A. Nasser, Michael D. Dingman, Edsel B. Ford, II, William Clay Ford, William Clay Ford, Jr., Irvine O. Hockaday, Jr., Marie-Josee Kravis, Ellen R. Marram, Homer A. Neal, Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, John L. Thornton, and Ford Motor Company (collectively "Defendants"), by and through their counsel, Feeney Kellett Wienner & Bush and Morris, Nichols, Arsht & Tunnell, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1, move to dismiss the Amended Verified Shareholder Derivative Complaint in this matter on the grounds that plaintiff has failed to state a claim and failed to plead with particularity that demand is excused. In support of this Motion, Defendants' rely upon their Brief in Support filed herewith.

Pursuant to LR 7.1, Defendants sought the concurrence of Plaintiff in the relief requested. Plaintiff, however, refused to concur, thus, necessitating this Motion.

Respectfully submitted,

Seth D. Gould (Mich. Bar No. P45465)
FEENEY KELLETT WIENNER & BUSH
35980 Woodward Avenue, Second Floor
Bloomfield Hills, MI 48304-0934
(248) 258-1580

Attorneys for Defendants Jacques A. Nasser, Michael D. Dingman, Edsel B. Ford, II, William Clay Ford, William Clay Ford, Jr., Irvine O. Hockaday, Jr., Marie-Josee Kravis, Ellen R. Marram, Homer A. Neal, Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, and John L. Thornton, and Ford Motor Company

and

- 2 -

OF COUNSEL:

A. Gilchrist Sparks, III (Del. Bar No. 0467)
Kenneth J. Nachbar (Del. Bar No. 2067)
Jessica Zeldin (Del. Bar No. 3558)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

Dated:  March 25, 2002

278834

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NORMAN SALSITZ,                          :

        Plaintiff,                      :

v,                                       :

JACQUES A. NASSER, MICHAEL D.            :
DINGMAN, EDSEL B. FORD, II,              :
WILLIAM CLAY FORD, WILLIAM CLAY          :       Case No. 00-74181
FORD, JR., IRVINE O. HOCKADAY,           :
JR., MARIE-JOSEE KRAVIS, ELLEN R.        :       Hon. George E. Woods
MARRAM, HOMER A. NEAL, JORMA J.          :
OLLILA, CARL E. REICHARDT, ROBERT        :       Magistrate Judge Pepe
E. RUBIN, and JOHN L. THORNTON,          :

        Defendants,                     :

    - and -                          :

FORD MOTOR COMPANY,                      :

        Nominal Defendant.              :





---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## MOTION TO DISMISS THE AMENDED COMPLAINT

A. Gilchrist Sparks, III (Del. Bar No. 467)
Kenneth J. Nachbar (Del. Bar No. 2067)
Jessica Zeldin (Del. Bar. No. 3558)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

LOCAL COUNSEL:

Seth D. Gould (Mich. Bar No. P45465)
FEENEY KELLETT WIENNER & BUSH
35980 Woodward Avenue, Second Floor
Bloomfield Hills, MI 48304-0934
(248) 258-1580

Attorneys for Defendants Jacques A. Nasser,
Michael D. Dingman, Edsel B. Ford, II, William Clay
Ford, William Clay Ford, Jr., Irvine O. Hockaday, Jr.,
Marie-Josee Kravis, Ellen R. Marram, Homer A. Neal,
Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, and
John L. Thornton, and Ford Motor Company

i.

## I.  STATEMENT OF THE ISSUES PRESENTED

(1)   Is plaintiff's failure to make pre-suit demand on Ford's Board of Directors, as required by Federal Rule of Civil Procedure 23.1 and substantive Delaware law, excused?

ii.

## II.   CONTROLLING AUTHORITIES

**Cases**      **Page(s)**

Allison v. General Motors Corp.,
    604 F. Supp. 1106 (D. Del.),
    aff'd, 782 F.2d 1026 (3d Cir. 1985)      14, 15

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984)      7, 8, 26, 27

Ash v. McCall,
    C.A. No. 17132, 2000 WL 1370341,
    Chandler, C. (Del. Ch. Sept. 15, 2000)      8, 14

Baks v. Moroun,
    576 N.W.2d 413 (Mich. App.), appeal denied, 593 N.W.2d
    556 (Mich. 1998)      24

Bell Atlantic Corp. v. Bolger,
    2 F.3d 1304 (3d Cir. 1993)      18

Boeing v. Shrontz,
    C.A. No. 11273, 1992 WL 81228, Berger, V.C. (Del. Ch.
    Apr. 20, 1992)      17

Brehm v. Eisner,
    746 A.2d 244 (Del. 2000)      7, 9

Carteret Bancorp, Inc. v. The Home Group, Inc.,
    C.A. Nos. 9380 & 9386, 1998 WL 3010, Allen, C. (Del.
    Ch. Jan. 13, 1998)      16

Erikson v. American Motors Corp.,
    683 F. Supp. 644 (E.D. Mich. 1987)      25

Harris v. Carter,
    582 A.2d 222 (Del. Ch. 1990)      10

In re Abbott Labs. Derivative S'holders Litig.,
    141 F. Supp.2d 946 (N.D. Ill. 2001)      19, 20

In re Baxter Int'l, Inc. S'holders Litig.,
    654 A.2d 1268 (Del. Ch. 1995)      17

In re Caremark Int'l Inc. Derivative Litig.,
    698 A.2d 959 (Del. Ch. 1996)      12, 13, 17

iii.

## II.   CONTROLLING AUTHORITIES (continued)

Page(s)

In re Dataproducts Corp. S'holders Litig.,
    C.A. No. 11164, 1999 WL 1271885, Jacobs, V.C. (Del. Ch.
    Aug. 22, 1991)      17, 18

In re Lukens Inc. S'holders Litig.,
    757 A.2d 720 (Del. Ch. 1999)      24

In re ML/EQ Partnership Litig.,
    Consol. C.A. No. 15741, 1999 WL 1271855, Strine, V.C.
    (Del. Ch. Dec. 20, 1999)      24, 25, 26

Kamen v. Kemper Fin. Serv., Inc.,
    500 U.S. 90 (1991)      8

Levine v. Smith,
    591 A.2d 194 (Del. 1991)      9

Malpiede v. Townson,
    780 A.2d 1075 (Del. 2000)      16, 18, 24

McCall v. Scott,
    239 F.3d 808, amended by, 250 F.3d 997 (6th Cir. 2001)      passim

Phelps v. McClellan,
    30 F.3d 658 (6th Cir. 1994)      25

Pogostin v. Rice,
    480 A.2d 619 (Del. 1984)      18, 27

Rabkin v. Phillip A. Hunt Chem. Corp.,
    547 A.2d 963 (Del. Ch. 1987)      12

Rales v. Blasband,
    634 A.2d 927 (Del. 1993)      9, 10, 11

Richardson v. Graves,
    C.A. No. 6617, 1983 WL 21109, Longobardi, V.C. (Del.
    Ch. June 17, 1983)      9

Rosenblatt v. Getty Oil Co.,
    493 A.2d 929 (Del. 1985)      12

Seminaris v. Landa,
    662 A.2d 1350, 1354 (Del. Ch. 1995)      11, 14

iv.

## II.   CONTROLLING AUTHORITIES (continued)

Page(s)

Spiegel v. Buntrock,
    571 A.2d 767 (Del. 1990)    8

Stephens v. Dixon,
    536 N.W.2d 75 (Mich. 1995)    25

White v. Panic,
    783 A.2d 543 (Del. 2001)    7, 8, 9

White v. Panic,
    C.A. No. 16800, 2000 WL85046, Lamb, V.C. (Del. Ch.
    Jan. 19, 2000), aff'd, 783 A.2d 543 (Del. 2001)    9, 11, 14, 23

**Statutes**

Del. Code Ann. Tit. 8, § 141(c) (2002)    21

Del. Code Ann. Tit. 8, § 8106 (2002)    24

Del. Code Ann., Tit. 8, § 102(b)(7) (2002)    passim

Fed. R. Civ. P. 12(b)(6)    13

Fed. R. Evid. 201    16

Federal Rule of Civil Procedure 23.1    passim

M.C.L.A. § 450.1541a (2001)    24, 26

M.C.L.A. § 600.5861 (2001)    25

**Other Authorities**

Corporate Director's Guidebook, 33 Bus. Law 1595 (July 1978)    12

Donald J. Wolfe, Jr. & Michael A. Pittenger,
    Corporate and Commercial Practice in the Delaware Court
    of Chancery § 4-3 (1998)    8

### III.   INTRODUCTION AND STATEMENT OF THE PROCEEDING

Plaintiff, a putative shareholder of nominal defendant Ford Motor Company ("Ford" or the "Company"), filed this derivative action against the then-current members of Ford's Board of Directors on September 18, 2000. On February 25, 2002, plaintiff filed an amended complaint (the "Amended Complaint") that included a new allegation of wrongdoing but no more detail or particularity. Plaintiff concedes that he did not make a pre-suit demand on Ford's Board of Directors before filing either the original or Amended Complaint.

Plaintiff's Amended Complaint must be dismissed because demand on Ford's Board of Directors is not excused under the circumstances. Federal Rule of Civil Procedure 23.1 and applicable Delaware precedents require a plaintiff to plead particularized allegations of fact that a majority of the director defendants have a disabling conflict that precludes them from independently considering a demand by plaintiff for corrective action. Plaintiff's complaint fails to meet this standard.

The well-pled allegations of the one-count complaint admittedly implicate no possible duty other than the duty of care. Moreover, Ford has a provision in its Certificate of Incorporation that, as authorized by Section 102(b)(7) of the Delaware General Corporation Law, immunizes the director defendants from personal liability resulting from such alleged breaches. The existence of that specific exemption from liability, together with the already substantial hurdles imposed by Rule 23.1, make it clear that plaintiff's demand futility contentions are insufficient to deprive the Board of its managerial prerogative to control Ford's response to the alleged wrongdoing.

2.

## IV.   ALLEGATIONS OF THE AMENDED COMPLAINT

The following facts are based on the well-pled allegations of the Amended Complaint.  As is appropriate in arguing a motion to dismiss, the defendants neither admit nor deny any of these allegations.  Rather, they simply accept these allegations for the purpose of showing that the allegations do not excuse the plaintiff's failure to make pre-suit demand upon Ford's Board of Directors.

### A.   THE PARTIES.

Plaintiff is a purported shareholder of nominal defendant Ford (Am. Compl. ¶ 14).  Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan.  It is the world's largest truck manufacturer and the second largest manufacturer of cars and trucks.  Ford allegedly manufactures and distributes vehicles under the Aston Martin, Ford, Jaguar, Lincoln, Mercury, Mazda, Land Rover and Volvo brands, including the Ford Explorer (Am. Compl. ¶ 29).

Defendants Jacques A. Nasser, William Clay Ford, Jr., Edsel B. Ford, II and William Clay Ford were, at some times relevant to the Amended Complaint, both directors and officers of Ford.  The remaining nine defendants, Michael D. Dingman, Irvine O. Hockaday, Marie Josee-Kravis, Ellen R. Marram, Homer A. Neal, Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin and John L. Thornton (collectively with the defendants other than Ford, the "Individual Defendants"), were at some point in time members of Ford's Board of Directors, but were at no time members of Ford's management.  All are alleged to have been directors at the time this suit was commenced (Am. Compl. ¶ ¶ 15-27).

B.     THE T.F.I. MODULES.

Plaintiff's Amended Complaint alleges that numerous accidents have resulted from a faulty computerized ignition system component, known as a thick film ignition module ("T.F.I. module"), that was installed on Ford vehicles prior to and between the years 1983 and 1995 (see, e.g., Am. Compl. ¶¶ 3, 33). Problems with the T.F.I. module have, according to plaintiff, led to litigation that has subjected the Company to damages (Am. Compl. ¶¶ 38-39, 66).[1]

The Amended Complaint attempts to link the Individual Defendants with these T.F.I. module problems by claiming that Ford's Board of Directors failed to take remedial measures despite knowing of the problem and despite the existence of certain alleged "red flags" (Am. Compl. ¶ 11). Plaintiffs' allegations make clear, however, that potential T.F.I. problems were discussed repeatedly by Ford management and were the subject of specific Board oversight (see, e.g., Am. Compl. ¶ 58 (noting that Ford engineers engaged in "heated internal debate" on the issue); Am. Compl. ¶ 56 (board commissioned management to study the issue); Am. Compl. ¶ 62 (Board received a report from Ford's North American Product Program Review Committee)).

The Amended Complaint alleges that Ford received numerous complaints of problems relating to the T.F.I. module from car owners dating back to the early 1980s (Am. Compl. ¶ 53). In April 1982, according to plaintiff, Ford engineers began to raise concerns regarding the overheating of the T.F.I. module (Am. Compl. ¶ 46). In 1982, and again in 1984, Company engineers compiled various T.F.I. module statistics (Am.

---

[1]     Ford has settled some of these lawsuits without any admission of liability on its behalf (see Am. Compl. ¶¶ 4-5, 38). Plaintiff acknowledges that he has had the benefit of the discovery taken in these lawsuits (see Am. Compl. ¶ 50).

4.

Compl. ¶¶ 46-47). In 1985, Ford's Board was informed that a special Company task force was studying reports of ignition module failure in certain climates (Am. Compl. ¶ 48). This task force repeatedly discussed T.F.I. module performance (Am. Compl. ¶¶ 51-52). In 1986, the government conducted an investigation of the T.F.I. module, which it closed the same year after making no conclusive findings (Am. Compl. ¶ 58). Also in 1986, the Board requested that management prepare a detailed report on the T.F.I. module to be given to the Company's top management (Am. Compl. ¶¶ 34, 56). Subsequently, the Board received reports from management in both November and December 1986 concerning the T.F.I. module, including a report concerning the advisability of a replacement program (Am. Compl. ¶¶ 61-62).

As a result of these studies, in November 1986, Ford replaced certain ignition modules on over one million vehicles (Am. Compl. ¶¶ 62-63). In 1995, Ford completely stopped attaching the T.F.I. module to the engine's distributor (Am. Compl. ¶ 65).

## C.   THE FIRESTONE-BRIDGESTONE TIRES.

Plaintiff's Amended Complaint also alleges that numerous accidents have resulted from sudden tread separation on the tires manufactured by the Firestone-Bridgestone Company ("Firestone-Bridgestone") and installed on Ford's Explorer sport utility vehicle (see, e.g., Am. Compl. ¶¶ 6, 70, 94). As a result of these accidents, according to plaintiff, Ford has expended approximately $3 billion in a Company-initiated replacement program, has suffered injury to its reputation and has been exposed to potential liability through lawsuits and regulatory actions (Am. Compl. ¶¶ 7-8, 12, 88-89, 94).

The Amended Complaint attempts to link the Individual Defendants with these tire problems by claiming that the Board either "knew or recklessly disregarded" these tire problems, and that the Board failed to take effective remedial measures (Am. Compl. ¶ 94). In support of this theory, plaintiff claims a number of "red flags" supposedly ignored by the Ford Board of Directors (Am. Compl. ¶¶ 11, 102). Specifically, plaintiff alleges that the Individual Defendants should have known that these tires would be problematic because different tires manufactured by Firestone-Bridgestone, when it was under different management, were recalled almost twenty years earlier (Am. Compl. ¶ 71).

Plaintiff further claims that in 1992 motorists in Saudi Arabia and Venezuela complained that they were experiencing blowouts while driving Ford vehicles equipped with Firestone tires, and that on September 5, 1996, the Houston Chronicle reported that an American television reporter, while driving a Ford Explorer, was involved in an accident in which the tread on his Bridgestone-Firestone tires separated (Am. Compl. ¶ 77). The Amended Complaint includes very little more about these incidents, and makes no claim that the Ford Board of Directors knew of them.

In July 1998, a researcher from State Farm Insurance also allegedly advised the National Transportation Safety Administration that he had studied 21 cases of tread separation on various Bridgestone-Firestone tires (Am. Compl. ¶ 78). It is not alleged that these tires were used on any Ford vehicles, or that this researcher shared this information with Ford, much less with its Board.

In October 1998, Ford began to notice problems of tread separation on Bridgestone-Firestone tires mounted on the Explorer and other light truck models in

6.

Venezuela (Am. Compl. ¶ 79). Ford promptly sent samples of the tires to Bridgestone-Firestone for testing (id.). Plaintiff does not allege that anyone at the Board level knew of the alleged problem in Venezuela.

Ford recognized the tire problem and took remedial measures. Because it was believed that tire separation resulted from unique road conditions in certain foreign nations, these remedial actions were initially focused abroad (see Am. Compl. ¶¶ 80, 92; see also id. at 79). Ford issued recalls in at least 16 overseas markets, including an August 1999 replacement campaign in Saudi Arabia (Am. Compl. ¶¶ 80, 83).

On August 9, 2000, Bridgestone-Firestone announced a region-by-region recall of more than 6.5 million tires, most of which were installed on Ford vehicles (Am. Compl. ¶ 84). In May 2001, Ford announced its own plan to pay for the replacement of 13 million Firestone tires that were not included in Bridgestone-Firestone's initial 6.5 million tire recall (Am. Compl. ¶¶ 8, 87).

D.    PALLADIUM PURCHASING PRACTICES.

Finally, plaintiff attacks the practices of Ford's purchasing department with respect to palladium, a precious metal used in emission control systems (Am. Compl. ¶¶ 9, 96). The purchasing department, according to plaintiff, was not adequately informed of the engineering department's palladium needs (Am. Compl. ¶¶ 9, 97). The Amended Complaint also claims that these personnel, who were admittedly experienced in buying metals, were not properly hedging their purchases (Am. Compl. ¶¶ 9, 97). Plaintiff faults Ford's Board of Directors for these alleged purchasing problems and for the subsequent palladium write-down on Ford's financial statements (see Am. Compl. ¶¶ 10, 95, 98-99). The Amended Complaint, however, contains no allegations that the

Board had any specific knowledge of the purchasing department's palladium-buying activities.

  E.  PLAINTIFF FILES SUIT.

    Despite the fact that plaintiff alleges that the T.F.I. module problem began in the early 1980s and that Ford first took remedial action 16 years ago, plaintiff waited until September of 2000 to file his derivative complaint. Plaintiff, while conceding that this suit is derivative in nature, pleads no excuse for his delay in filing suit and includes no particularized allegations sufficient to excuse his failure to make a pre-suit demand on Ford's Board of Directors.

  V.  **ARGUMENT**

    A.  THE AMENDED COMPLAINT MUST BE DISMISSED IN ITS ENTIRETY BECAUSE PLAINTIFF FAILED TO MAKE PRE-SUIT DEMAND UPON FORD'S BOARD OF DIRECTORS.

      1.  The Demand Futility Standard.

    The Amended Complaint is fatally defective for its failure to plead that a pre-suit demand has been made upon Ford's Board of Directors. Federal Rule of Civil Procedure 23.1 and applicable Delaware precedents require that, as a prerequisite to a shareholder derivative suit, the disgruntled shareholder must demand that the board take action against the alleged wrongdoers, or alternatively, must plead, with particularity, that demand is excused because such demand would be futile. See Fed. R. Civ. P. 23.1; White v. Panic, 783 A.2d 543, 550-51 (Del. 2001) (en banc); Brehm v. Eisner, 746 A.2d 244, 254-55 (Del. 2000); Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984); Ash v.

8.

McCall, C.A. No. 17132, 2000 WL 1370341, at *6, Chandler, C. (Del. Ch. Sept. 15, 2000) (Ex. A).[2]

The demand requirement recognizes the "cardinal precept of the General Corporation Law of the State of Delaware ... that directors, rather than shareholders, manage the business and affairs of the corporation," Aronson, 473 A.2d at 811, by providing the board with an opportunity to address shareholder concerns without litigation and to decide what action, if any, is in the best interests of the corporation. Spiegel v. Buntrock, 571 A.2d 767, 773 (Del. 1990); see also White, 783 A.2d at 550 ("In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation"). Additionally, the demand requirement "insure[s] that a stockholder exhausts his intracorporate remedies, and ... provide[s] a safeguard against strike suits." Aronson, 473 A.2d at 811-12 (citations and footnotes omitted).

Recognizing that "by its very nature the derivative action impinges on the managerial freedom of directors," Aronson, 473 A.2d at 811, both Rule 23.1 and applicable Delaware law require that plaintiffs claiming demand futility must do so with particularity. Fed. R. Civ. P. 23.1; McCall v. Scott, 239 F.3d 808, 815, amended by, 250

_____

[2]    Because Ford is a Delaware corporation, Delaware law provides the substantive rule governing demand futility. Cf. Kamen v. Kemper Fin. Serv., Inc., 500 U.S. 90, 97-107 (1991) (holding that demand futility doctrine is substantive such that the law concerning the demand requirement in a derivative action is that of the state of incorporation). In interpreting Delaware law, this Court may rely on unpublished opinions from the Delaware Court of Chancery. See Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 4-3 (1998) (noting that the fact that the Court of Chancery does not generally report its opinions, "should not be taken to suggest that unpublished decisions are without precedental value. Emphatically to the contrary, unpublished letter and memorandum opinions, and even some oral rulings from the bench, are afforded considerable precedental weight . . .").

F.3d 997 (6th Cir. 2001); see also Levine v. Smith, 591 A.2d 194, 207 (Del. 1991)
(plaintiff's pleading burden is "more onerous than that required to withstand a Rule
12(b)(6) motion to dismiss"); White, 783 A.2d at 550-51. Thus, "Rule 23.1 is not
satisfied by conclusory statements or mere notice pleading . . . . What the pleader must
set forth are particularized factual statements that are essential to the claim." Brehm, 746
A.2d at 254 (explaining that Rule 23.1 pleadings "must comply with stringent
requirements of factual particularity that differ substantially from the permissive notice
pleadings governed solely by Chancery Rule 8(a)"); Richardson v. Graves, C.A. No.
6617, 1983 WL 21109, at *2, Longobardi, V.C. (Del. Ch. Mar. 7, 1983) ("generalities,
artistically ambiguous, all-encompassing conclusory allegations are not enough" to
excuse demand) (Ex. B).

      The demand requirement is particularly stringent in cases such as this one
where, at least as to matters involving a majority of the present Board, plaintiff does not
challenge a specific decision made by the directors, but instead asserts that they failed to
properly monitor the activities of the corporation. See White v. Panic, C.A. No. 16800,
2000 WL 85046, at *9, Lamb, V.C. (Del. Ch. Jan. 19, 2000) (describing onerous pleading
standards for a failure to supervise claim), aff'd, 783 A.2d 543 (Del. 2001) [hereinafter
"White I"] (Ex. C). As the Delaware Supreme Court has observed, "requiring demand in
such circumstances is consistent with the board's managerial prerogatives because it
permits the board to have the opportunity to take action where it has not previously
considered doing so." Rales v. Blasband, 634 A.2d 927, 934 n.9 (Del. 1993).

      In oversight cases, and also with respect to claims arising so far in the past
that a majority of board members at the time suit is commenced were not board members

at the time of the challenged conduct, demand is excused only where the complaint contains particularized facts creating a reasonable doubt that a majority of the directors in office when suit was commenced would have been independent and disinterested when considering the demand. Id. at 936; see also Harris v. Carter, 582 A.2d 222, 230 (Del. Ch. 1990) (explaining that where there is a change in board control between date of challenged transaction and date of suit, the test is whether the "present board is or is not disabled from exercising its right and duty to control corporate litigation"). Because the well-pled allegations of plaintiff's Amended Complaint fail to demonstrate any interestedness or lack of independence on behalf of a majority of Ford's directors at the time this suit was commenced, the Amended Complaint must be dismissed.

> 2.    Plaintiff Has Not Alleged With Particularity Facts Creating A Reasonable Doubt That A Majority Of The Present Board Members Have A Disqualifying Interest That Would Justify Excusing Demand.

. A director is considered interested for purposes of excusing pre-suit demand when he or she receives a personal financial benefit not shared equally with the stockholders or where the decision to initiate suit will detrimentally impact the director but not the corporation and its stockholders. See, e.g., Rales, 634 A.2d at 936; McCall, 239 F.3d at 817.

Here, the Amended Complaint does not allege that any of the Individual Defendants were motivated by any personal interest or received any financial benefit. Rather, plaintiff claims in conclusory terms (1) that a majority of the Individual Defendants "face a substantial likelihood of liability in connection with their repeated intentional or reckless abdication and dereliction of their fiduciary duty to ensure that

Ford has an enforced policy to ensure the safety of its vehicles ..." and (2) that the Individual Defendants will not prosecute an action against themselves (Am. Compl. ¶¶ 105-107).   As discussed hereafter these allegations, whether viewed alone or in conjunction with all of the pleadings in the Amended Complaint, are insufficient to create a reasonable doubt that any of the Individual Defendants have a disqualifying interest such as to justify excusing demand.

        a.     None Of The Individual Defendants,
                 Much Less A Majority, Face A
                 Substantial Likelihood Of Liability.

Directors who are sued for failure to oversee subordinates only have a disabling interest for purposes of pre-suit demand when "the potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'" Rales, 634 A.2d at 936 (citation omitted); McCall, 239 F.3d at 817.   For the reasons discussed below, plaintiff cannot overcome the "high standard" to establish a "substantial likelihood" of personal liability that would prevent the present Board from impartially considering a demand. White I, 2000 WL 85046, at *5; see also Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995).

        (i)     As To Claims Asserted For
                 Acts Or Omissions Prior To
                 1988, There Cannot Be
                 Substantial Likelihood Of
                 Liability With Respect To A
                 Majority of The Board
                 Members In Office When
                 Suit Was Filed.

In the Amended Complaint, plaintiff makes reference to and describes events relating to the T.F.I. modules, which took place at various times beginning in

1982, and most of which concluded in 1986 (see, e.g., Am. Compl. ¶¶ 46-47, 56). Plaintiff does not, however, appear to seek relief for any conduct action or act or omission occurring more than ten years ago (see Am. Compl. ¶ 2 (expressing uncertainty as to the existence of a claim based on events occurring more than ten years ago)). In any event, even assuming the Amended Complaint does purport to assert claims for conduct occurring prior to 1988, it is clear that a majority of the Board were not directors of Ford at any time prior to 1988 (see Am. Compl. ¶¶ 15-17, 21-24, 26-27). Accordingly, there can be no likelihood that a majority of the present Board faces personal liability with respect to pre-1988 conduct, such that any pre-1988 claims must be dismissed by reason of plaintiff's failure to make demand as required by Rule 23.1.

<div style="margin-left: 2em;">

(ii)   Because    The    Amended
Complaint   Concedes   That
Ford  Maintained  Monitoring
Systems,    The    Individual
Defendants     Face      No
Substantial   Likelihood   Of
Liability.

</div>

Delaware law recognizes that "[t]he realities of modern life are such that directors cannot be expected to manage the day-to-day activities of a company." Rosenblatt v. Getty Oil Co., 493 A.2d 929, 943 (Del. 1985); see also Rabkin v. Phillip A. Hunt Chem. Corp., 547 A.2d 963, 971 (Del. Ch. 1987) (one managing a business is not expected to know, "in minute detail, everything that transpires as part of the company's day-to-day operations"). Rather, the responsibility of the board is "limited to overseeing such operation." Corporate Director's Guidebook, 33 Bus. Law 1595, 1603 (July 1978). Liability for breaching this duty to monitor exists only where the board lacks "good faith as evidenced by sustained or systematic failure . . . to exercise reasonable oversight." In

13.

re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996).[3] The Amended
Complaint, which attempts to saddle Ford's Board with responsibility for the detailed
day-to-day operations of the Company, including vehicle design and parts purchasing,
cannot meet this standard, let alone demonstrate a substantial likelihood of liability for
failure to monitor.

The Amended Complaint is replete with evidence that Ford had effective
monitoring systems in place. For example, the Company addressed concerns through
standing committees, issued reports and formed task forces (Am. Compl. ¶¶ 48, 51, 55,
56, 59).[4] These monitoring systems worked effectively enough for Ford to initiate a
T.F.I. module replacement campaign, and to notice tread separation concerns overseas,
raise those concerns with Firestone-Bridgestone and address the issue by increasing
safety testing (see Am. Compl. ¶¶ 79, 80; see also id. at 69).

Moreover, it is undisputed that Ford has taken remedial measures. The
Company recalled and replaced tires in Saudi Arabia, Venezuela and the United States
(Am. Compl. ¶ 14). Ford initiated a recall of selective T.F.I. modules, effecting over one

---

[3]  Delaware courts have noted that, for "good policy reasons," the lack of oversight
theory advanced by plaintiff here is "possibly the most difficult theory in
corporation law upon which a plaintiff might hope to win a judgment."
Caremark, 698 A.2d at 967. For the reasons discussed in this subsection, not only
do plaintiff's allegations fail to satisfy the stringent requirements of Rule 23.1, but
they also fail to state a claim for gross negligence, such that their dismissal is
warranted pursuant to Fed. R. Civ. P. 12(b)(6). See McCall, 239 F.3d at 818
(noting that Delaware law has adopted gross negligence as the standard for
measuring a director's liability for a breach of the duty of care).

[4]  Plaintiff's initial complaint included even more evidence of the Company's
effective monitoring systems. It alleged, for example, that Ford contracted with
an outside research facility to test the performance of Bridgestone-Firestone's
tires (Compl. ¶ 30). The original complaint also recited that Ford switched tire
brands in certain geographic areas (Compl. ¶ 41). Plaintiff has conveniently
deleted these and other similar allegations from his current pleading.

million cars, in November 1986 (Am. Compl. ¶¶ 73-74). By 1995, Ford had completely stopped attaching T.F.I. modules to its engines' distributors (Am. Compl. ¶ 75). The existence of these remedial measures is utterly inconsistent with a finding of lack of oversight. See White I, 2000 WL 85046, at *12 (finding that demand was not futile because "the allegations of the complaint show that the board has *responded* to this perceived threat [of widespread sexual harassment]."). In the face of these facts, plaintiff simply cannot stand on his conclusory allegations that the Individual Defendants "turned a blind eye" to safety issues. See Seminaris, 662 A.2d at 1355 (holding that conclusory allegations that the directors "looked the other way" while the chief executive officer artificially inflated financial results was insufficient to excuse demand).

Finally, with regard to the tire and palladium problems, the Amended Complaint contains absolutely no well-pled allegations that any of, let alone a majority of, the Individual Defendants knew of the alleged issues. All that is pled is that Ford was aware of, and responded to, some incidents regarding tire separation (see, e.g., Am. Compl. ¶¶ 30, 39). This institutional knowledge cannot be imputed to the Individual Defendants. See Ash, 2000 WL 1370341, at *14 (dismissing oversight case for failure to make demand after finding no reason to impute knowledge of statement made by company spokesperson to company's board of directors).

This would not be the first time that a Court held that car manufacturers have a right to have their Boards of Directors control derivative litigation premised upon claims of insufficient oversight of car-making activities. In Allison v. General Motors Corp., 604 F. Supp. 1106 (D. Del.), aff'd, 782 F.2d 1026 (3d Cir. 1985), the United States District Court for the District of Delaware rejected allegations of demand futility similar

to those pled here.  The <u>Allison</u> plaintiffs argued that pre-suit demand was excused because the individual defendants, "as members of the GM Board, participated in the underlying wrongs, i.e., the decision to manufacture and sell X-cars with a known brake deficiency and . . . to submit false and incorrect information to . . . the public."  <u>Id.</u> at 1114.  Rejecting this allegation, the District Court stated:

> [U]nless a plaintiff makes sufficiently particular allegations of participation, self-dealing, bias, bad faith, or corrupt motive, failure to make a demand will not be excused. Plaintiff has not made particular allegations of this nature. The mere fact that plaintiff names members of the Board of Directors as defendants or even makes conclusory allegations of director wrongdoing does not suffice to excuse demand.

<u>Id.</u> (citation omitted).

As in <u>Allison</u>, plaintiff here has provided absolutely no facts to substantiate any level of Board participation by a majority of the Board in office when the Complaint was filed in the tire, ignition or palladium problems.  In short, the allegations of the Amended Complaint are conclusory and totally insufficient to demonstrate that any of the Individual Defendants, much less the required Board majority, face a substantial likelihood of liability such that they could be deemed "interested" for purposes of excusing demand.

        (iii)    Even If Plaintiff Could Prove Gross Negligence, A Majority Of The Incumbent Board Still Faces No Substantial Likelihood Of Liability.

Section 102(b)(7) of the Delaware General Corporation Law, Del. Code Ann. Tit. 8, § 102(b)(7) (2002), provides that the shareholders of any Delaware

corporation may adopt a charter provision that eliminates directors' personal liability to the corporation or its shareholders for certain breaches of duty, including violations of the duty of care. Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2000) (en banc). Since June 4, 1987, Ford's Certificate of Incorporation has included such a provision (Ex. D). Specifically, Article Eighth, Section 5.1 provides:

> **5.1. Limitations on Liability of Directors.** A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability
>
> (i) for any breach of the director's duty of loyalty to the corporation or its stockholders,
>
> (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law,
>
> (iii) under Section 174 of the Delaware General Corporation Law, or
>
> (iv) for any transaction from which the director derived an improper personal benefit.[5]

This provision protects the Individual Defendants from personal liability for all claims alleged to have arisen after the June 4, 1987 adoption date.[6]

---

[5]   Defendants ask the Court to take judicial notice of Section 5.1 in deciding this motion. See Fed. R. Evid. 201; McCall, 239 F.3d at 818; see also Malpiede, 780 A.2d at 1090 & 1092.

[6]   The Amended Complaint does contain a boilerplate prayer for an order directing the Individual Defendants to refrain from further breaches of fiduciary duty and to implement unspecified corrective measures. Wholly apart from the fact such prayer is so vague and unspecific as to be legally insufficient, see Carteret Bancorp, Inc. v. The Home Group, Inc., C.A. Nos. 9380 & 9386, 1998 WL 3010, Allen, C. (Del. Ch. Jan. 13, 1998) (Ex. E), to the extent the Amended Complaint survived a Section 102(b)(7) dismissal only as an injunction action, it would clearly be subject to dismissal under Fed. R. Civ. P. 23.1 given the absence of any substantial likelihood that a majority of the Board members at the time suit was filed face potential monetary liability.

Where a company's certificate of incorporation contains an exculpatory provision adopted pursuant to Section 102(b)(7), there can be no substantial likelihood of personal liability capable of disabling the directors from considering a demand fairly, unless the pleading contains particularized facts of conduct outside the provision's exculpatory effect. Caremark, 698 A.2d 971 & n.28; In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995); McCall, 239 F.3d at 818 (explaining that when the factual basis for a claim implicates only the duty of care, the effect of Section 102(b)(7) "may properly be considered and applied in deciding a motion to dismiss for failure to make a pre-suit demand").

Plaintiff's one-count Amended Complaint, while alternatively and repeatedly pleading knowledge or recklessness in conclusory terms, ultimately alleges with respect to post-1987 events only that the Individual Defendants' breached their fiduciary duty of care by failing to inform themselves, adopt remedial measures and oversee the purchasing and design of certain products (Am. Compl. ¶ 109) ("The Individual Defendants knowingly or recklessly breached their fiduciary duties of care"). All of these allegations fall within the protection of Ford's exculpatory charter provision and Section 102(b)(7). See, e.g., In re Dataproducts Corp. S'holders Litig., C.A. No. 11164, 1999 WL 1271885, at *5, Jacobs, V.C. (Del. Ch. Aug. 22, 1991) (holding that Section 102(b)(7) charter provision barred claims based on the "directors' abdication of their oversight obligations," including claims of gross negligence) (Ex. F); Boeing v. Shrontz, C.A. No. 11273, 1992 WL 81228, at *3, Berger, V.C. (Del. Ch. Apr. 20, 1992) (explaining that plaintiffs could only assert a claim for lack of oversight in failing to prevent a pattern of misconduct by officers and employees in connection with various

government contracts to the extent that such acts occurred before the adoption of a valid Section 102(b)(7) charter provision) (Ex. G); Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1312-13 (3d Cir. 1993) (noting that a Section 102(b)(7) provision would serve as a bar to director liability for failure to exercise proper oversight over sales personnel whose actions resulted in a $40 million settlement of consumer fraud claims).

Plaintiff's Amended Complaint does not include any claim (much less any specific allegation of fact) that any Individual Defendant acted in bad faith, derived any improper personal benefit or breached any duty of loyalty that would remove any portion of plaintiff's post-1987 claims from the protection of Ford's charter or Section 102(b)(7). A breach of the duty of loyalty occurs only when a director sacrifices the best interest of the corporation and its shareholders in favor of a personal interest, such as financial gain, possessed by the director and not shared by the stockholders generally. See Pogostin v. Rice, 480 A.2d 619, 624 (Del. 1984); Malpiede, 780 A.2d at 1094. Here, however, the best plaintiff can do with respect to any loyalty issue is suggest that Ford's decision to partner with Firestone-Bridgestone may have been influenced by the fact that the now-deceased great-grandfather of one of the Company's Board members was affiliated with Firestone prior to its acquisition by the Japanese (see Am. Compl. ¶¶ 71-72). Such an unsupported, farfetched and irrelevant allegation is insufficient to question the motives and integrity of any Ford Board member, much less a majority. See Dataproducts, 1991 WL 165301, at *6 (complaint must do more than assert conclusory allegations of a loyalty violation to overcome dismissal based on a Section 102(b)(7) provision).

Nor does plaintiff state a duty of loyalty claim by alleging that certain executives would have faced negative repercussions for reporting design defects (see Am.

Compl. ¶ 44). This conclusory allegation is refuted by plaintiff's own complaint, which is replete with incidents of engineering executives reporting possible design problems (see, e.g., Am. Compl. ¶¶ 31, 33, 46-47, 54). More importantly, however, plaintiff does not allege that the Board members suffered from such divided loyalties.

Likewise, plaintiff's repeated conclusory allegations that the Individual Defendants "recklessly disregarded" adverse facts regarding vehicle safety does not avoid the exculpatory effect of Section 102(b)(7) and Ford's Certificate of Incorporation. The Sixth Circuit, in McCall, held that a claim of "recklessness" cannot constitute "intentional misconduct" or "bad faith" as used in Section 102(b)(7) unless the facts as pled involve conscious disregard of a known risk. McCall, 239 F.3d at 818-19.[7] The court found that the particularized facts in that case when taken together were sufficient to present a substantial likelihood of liability on the part of at least five directors, overcoming the protection of Section 102(b)(7) at the pleading stage. Id. at 819. Those facts bear no relationship to those pled here.

In McCall, plaintiffs alleged that the senior management of Columbia/HCA ("Columbia"), a for-profit health care management company, with Board knowledge, devised schemes to fraudulently increase revenue and profits, and perpetuated a management philosophy that provided strong incentives for employees to commit Medicare fraud. Id. at 814. In concluding that there was a substantial likelihood

---

[7]     There is no Delaware case holding that recklessness can be equated to intentional misconduct or bad faith as used in Section 102(b)(7), a fact which the court in McCall acknowledged in stating it to be "unclear" whether some reckless acts or omissions may be excluded from the protections of Section 102(b)(7). See McCall, 239 F.3d at 818-19; see also In re Abbott Labs. Derivative S'holders Litig., 141 F. Supp.2d 946, 949 (N.D. Ill. 2001) (commenting on McCall and stating that labeling defendants' conduct as reckless is not useful in determining whether they acted in bad faith).

that a majority of the Board was complicit in this illegal activity a "significant factor" was the court's detailed assessment derived from the pleadings of the prior experience of the five directors as former directors or managers of health care organizations that had been acquired by Columbia and in some cases had been prosecuted for Medicare fraud, such that those directors would have known that the rate of growth in Columbia's Medicare reimbursements could not have been achieved absent fraud.

Also, apparently relevant to the court's conclusion concerning conscious disregard of a known risk was Board knowledge of a <u>qui tam</u> action alleging Medicare fraud and of a federal criminal investigation in the face of which the Board took no action. <u>Id.</u> at 822. As succinctly summarized by the court in <u>Abbott</u> as it distinguished the facts of <u>McCall</u>:

> [In <u>McCall</u>], plaintiffs alleged specific facts suggesting that the directors knew about widespread fraudulent billing practices throughout the company. The complaint makes distinct allegations about each individual director's knowledge. It alleged that the audit committee's report included specific evidence of fraud, and that the board members, based on their individual credentials, would have understood the data's significance. The company's 10K described in detail multiple pending (before the demand date) lawsuits alleging these same fraudulent practices--and we can presume the directors had knowledge of the details listed in the public filings. The complaint also detailed federal criminal investigations by multiple agencies, search warrants, raids on corporate offices and affidavits from law enforcement officials about facts they discovered. In short, the McCall complaint detailed many facts about the directors, their backgrounds, their roles within the company and extraordinary events of which they were undoubtedly aware. The court found the board's failure to even investigate in the face of such overwhelming evidence of widespread wrongdoing raised doubts that they were acting in good faith. <u>Abbott</u>, 141 F. Supp.2d at 950.

The facts alleged in this case do not come close to meeting the standard for "bad faith" applied in <u>McCall</u>. In the first place, what is alleged is not a pervasive scheme to defraud affecting the major business activities of the Company. Rather, plaintiff alleges specific and technical design and purchasing problems involving three component parts: an ignition module, tires, and palladium used in catalytic convertors. As a general matter, these are day-to-day business activities with which the Board would not be familiar and about which they would appropriately rely on the expertise of company management. <u>See</u> Del. Code Ann. Tit. 8, § 141(e) (2002) (directors "fully protected" in relying in good faith upon information presented by officers or employees). There are no allegations here, as there were in <u>McCall</u>, that individual board members had particular expertise or knowledge about such matters. Moreover, the allegations of the Amended Complaint show that when these problems became material to the Company, the Board not only investigated them, but also took action.

According to the Amended Complaint, in 1986, after extensive investigation of the T.F.I. issue under the direction of the Board, Ford undertook an extensive owner notification program to replace distributor-mounted T.F.I. modules in over one million vehicles, notwithstanding the absence of a consensus among Ford's engineers, both before and after the program, that a problem existed (Am. Compl. ¶ 33 (heated dispute among Ford engineers throughout 1983-95 period regarding existence of the problem)). Moreover, distributor-mounted T.F.I. modules were completely eliminated by 1995 (Am. Compl. ¶ 65). The most that plaintiff can allege is that the Board did not do enough, but that hardly rises to the level of "conscious disregard of a known risk" as defined in <u>McCall</u>. Moreover, most of the facts alleged regarding T.F.I.

22.

modules, including allegedly misleading the NHTSA, occurred in 1986 or earlier, before a majority of the current Board members were in office (Am. Compl. ¶¶ 57, 58). Plaintiff has alleged no facts creating a substantial likelihood that a majority of the present Board has acted in "bad faith" with respect to T.F.I. modules.

The Amended Complaint also alleges no facts showing that the Board, collectively or individually, had knowledge of the early problems with Firestone-Bridgestone tires alleged in the Amended Complaint. To the contrary and without reference to any communication to the Board, the Amended Complaint specifically alleges that Ford management "failed to appreciate" the magnitude of the problem because the tires were separately warranted by Firestone-Bridgestone, Ford lacked sufficient information regarding tire failures, Ford accepted Firestone-Bridgestone's assurances that there was no widespread tire problem, and Ford believed that tire failures in foreign markets were caused by local climate and driving conditions (Am. Compl. ¶¶ 91-92). However, in 2001, when the extent of the problem became known, the Company undertook a massive program to replace Firestone-Bridgestone tires on Explorers (Am. Compl. ¶ 87). No specific facts are alleged showing that the Board had sufficient information or knowledge prior to 2001 to have initiated a massive replacement of Firestone-Bridgestone tires costing over $3 billion or that the failure to do so resulted from conscious disregard of a known risk. Even if plaintiff could show that the Board should have acted sooner, this is at most an alleged breach of the duty of care, not "bad faith" that could subject the Board to liability.[8]

---

[8]     Plaintiff's allegations regarding the design of the Explorer itself, rather than the problem with Firestone-Bridgestone tires, are irrelevant makeweight. There are no facts alleged that the design of the Explorer has caused any adverse

(Continued . . .)

In regard to palladium purchases, all of Plaintiff's allegations are directed to the lack of day-to-day coordination between the purchasing department and other functions within the Company. There are no specific allegations that the Board knew of these problems or that the Board failed to act when it did become aware of them.

Plaintiff, with the benefit of hindsight, apparently wants to take advantage of the confluence of three highly-publicized problems that have impacted the Company. However, stringing several ordinary duty of care claims together does not convert them into a "bad faith" claim. While the financial consequences of the T.F.I. issue have been felt recently, the conduct alleged occurred years ago, before the majority of the current board were even in office. The Firestone-Bridgestone tire and palladium issues, on the face of the Amended Complaint, involve the adverse effects of routine purchasing decisions not resulting from fraud or corrupt motive as in McCall, but because of unforeseen developments or mistakes in judgment in the day-to-day business activities of the Company. Plaintiff has alleged no facts that would convert these issues from what they are - unfortunate problems that the Board has sought to remedy -- into bad faith disregard on the part of the Board.

Similarly, plaintiff's allegation that Ford followed a practice of settling personal injury and wrongful death lawsuits does not show any bad faith on the part of the Ford Board. See White I, 2000 WL 85046, at *9 (holding that the fact that company

---

(. . . continued)

consequences to the Company. The Explorer has been one of the most successful and popular vehicles in the world for over a decade and there is no allegation of any adverse finding by a government agency, any recall, or any unusual costs incurred by Ford because of the design of the Explorer. Plainly, any decisions made by the Board about the design, manufacture, and marketing of the Explorer could not expose the Board to any "substantial likelihood" of liability.

was sued, settled some of the suits and chose not to seek contribution from the alleged perpetrator does not provide a sufficient basis to infer bad-faith conduct on the part of its directors).

In short, the allegations of the Amended Complaint are nothing other than duty of care claims. Accordingly, there is a high probability that plaintiff's post-1987 claims for money damages against the Individual Defendants would be barred by the exculpatory provision in Ford's charter, see Malpiede, 780 A.2d at 1094; In re Lukens Inc. S'holders Litig., 757 A.2d 720, 732-34 (Del. Ch. 1999), such that there cannot be a substantial likelihood of liability as to any Ford director in office at the time suit was filed.

> (iv)   Defendants Face No Liability
>        With  Respect  To  Those
>        Claims   That   Are   Time
>        Barred.

Delaware has a three-year limitations period for breach of fiduciary duty suits. Del. Code Ann. Tit. 8, § 8106 (2002); see also In re ML/EQ Partnership Litig., Consol. C.A. No. 15741, 1999 WL 1271855, at *2, Strine, V.C. (Del. Ch. Dec. 20, 1999) (Ex. H). Michigan law requires that breach of fiduciary duty claims be commenced within three years after the cause of action accrued or within two years after the cause of action is or reasonably should have been discovered. M.C.L.A. § 450.1541a (2001); see also Baks v. Moroun, 576 N.W.2d 413, 421 (Mich. App.), appeal denied, 593 N.W.2d

25.

556 (Mich. 1998). Under either state's law, plaintiff's claim for failure to monitor the Company's T.F.I. module safety standards is untimely.[9]

These claims accrued at the time the wrong upon which each claim is based occurred, regardless of the time when damages resulted. See id. at 423 n.9; Stephens v. Dixon, 536 N.W.2d 755, 756 (Mich. 1995); ML/EQ, 1999 WL 1271855, at *2. Here any alleged breach of fiduciary duty occurred when the Individual Defendants first failed to insure adequate monitoring of the Company's ignition module. With regard to the T.F.I. modules, this must have happened, under any theory articulated by plaintiff, sometime before 1986 when Ford took action to recall certain T.F.I. modules and certainly before 1995 when Ford stopped attaching the T.F.I. modules to the engine block (Am. Compl. ¶¶ 62-63, 65). Accordingly, plaintiff's T.F.I. claim, at best, accrued between seven and 14 years ago.[10]

---

[9]   A federal court sitting in diversity must apply the substantive law, including choice of law rules, of the state in which it sits. Phelps v. McClellan, 30 F.3d 658, 661 (6th Cir. 1994) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Statutes of limitations are considered by federal courts to be substantive and therefore governed by the choice of law rules of the forum state. Id. (citing Guaranty Trust Co. v. York, 326 U.S. 99 (1945)). Under Michigan choice of law rules, however, statutes of limitations are considered procedural and are also governed by the forum state. Erikson v. American Motors Corp., 683 F. Supp. 644, 645 (E.D. Mich. 1987) (citing (Schumumaker v. Tidswell, 360 N.W.2d 915 (Mich. App. 1984)). Accordingly, Michigan law applies to this claim.

Under Michigan's borrowing statute, a suit commenced in Michigan by a non-resident that is based on a cause of action accruing in another state is barred if either the applicable Michigan limitations period or the limitations period or the limitations period of the other state has expired. M.C.L.A. § 600.5861 (2001); Erikson, 683 F. Supp. at 645. Because plaintiff's claim is time barred under either Delaware or Michigan law, this brief does not need to address the issue raised by Michigan's borrowing statute regarding where a breach of fiduciary duty suit against directors of a Delaware corporation accrues.

[10]   Plaintiff, who bought his Ford shares in 1989 (Am. Compl. ¶ 14), does not even have standing to pursue this claim. See Fed. R. Civ. P. 23.1 (requiring that a derivative plaintiff own shares continuously from the time of the alleged
(Continued . . .)

The Amended Complaint includes no suggestion as to why plaintiff should not be held to the applicable limitations period. Specifically, there are no well-pled allegations suggesting that plaintiff reasonably could not have discovered his T.F.I. module cause of action until after two years prior to the filing of the original complaint, nor are there well-pled allegations of equitable tolling. See M.C.L.A. § 450.1541a(4) (2001) (two year discovery rule); ML/EQ, 1999 WL 1271855, at *3 (under equitable tolling theory, "limitations period is tolled only until the plaintiff discovers (or by exercising reasonable diligence should have discovered) his injury"). Accordingly, and in addition to all the reasons already discussed, the Individual Defendants face no liability, and certainly no substantial likelihood of liability, with regard to these claims.

        b.      Plaintiff's Often-Rejected Refrain That The Individual Defendants Would Have To Sue Themselves Also Does Not Render Them Interested.

Recognizing that he cannot plead with particularity that the Individual Defendants face any liability, let alone a substantial likelihood of liability, plaintiff asserts instead that "each Individual Defendant ... breached his or her fiduciary duties and, lacks the independence and good faith to prosecute this action against themselves" (Am. Compl. ¶ 107). As the Delaware Supreme Court made clear in Aronson, this type of generalized pleading will not excuse demand:

---

(. . . continued)
        wrongdoing to the time of the court's decision). Presumably, that is one reason why the Amended Complaint reflects some uncertainty as to the existence of a claim based upon events occurring more than ten years ago (see Am. Compl. ¶ 2).

> Plaintiff's final argument is the incantation that demand is
> excused because the directors otherwise would have to sue
> themselves, thereby placing the conduct of the litigation in
> hostile hands and preventing its effective prosecution. This
> bootstrap argument has been made to and dismissed by
> other courts. Its acceptance would effectively abrogate
> Rule 23.1 and weaken the managerial power of directors.

Aronson, 473 A.2d at 818 (citations omitted); see also Pogostin, 480 A.2d at 625 ("we

note that the plaintiffs' bootstrap allegations of futility, based on claims of directorial

participation in and liability for the wrongs alleged, coupled with a reluctance by

directors to sue themselves, were laid to rest in Aronson"). Accordingly, this allegation,

like those already discussed, is insufficient to excuse the stringent demand requirement of

Rule 23.1.

<p style="text-align:center">*     *     *     *</p>

Having failed to demonstrate, through particularized pleadings, a

reasonable doubt that a majority of the Individual Defendants face a substantial

likelihood of liability, plaintiff's failure to make a pre-suit demand on the Company's

Board is not excused. Plaintiff's Amended Complaint, therefore, must be dismissed in its

entirety for noncompliance with Federal Rule of Civil Procedure 23.1.

28.

## VI.   CONCLUSION

For all the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

_Seth Gould_

Seth D. Gould (Mich. Bar No. P45465)
FEENEY KELLETT WIENNER & BUSH
35980 Woodward Avenue, Second Floor
Bloomfield Hills, MI 48304-0934
(248) 258-1580

Attorneys for Defendants Jacques A. Nasser, Michael D. Dingman, Edsel B. Ford, II, William Clay Ford, William Clay Ford, Jr., Irvine O. Hockaday, Jr., Marie-Josee Kravis, Ellen R. Marram, Homer A. Neal, Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, and John L. Thornton, and Ford Motor Company

OF COUNSEL:

A. Gilchrist Sparks, III (Del. Bar No. 0467)
Kenneth J. Nachbar (Del. Bar No. 2067)
Jessica Zeldin (Del. Bar No. 3558)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

Dated: March **25**, 2002

277851

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED